For the reasons stated, the decree will be affirmed.

*Decree affirmed.*

# CHARLESTON.

## STATE v. PHILLIPS.

Submitted September 11, 1917. Decided September 25, 1917.

1. CRIMINAL LAW—*Capacity—Specific Intent—Intoxication.*

   In a case in which specific intent to do a forbidden act is essential to the commission of the offense, intoxication to the extent of deprivation of reason and will power constitutes a defense, if the act forbidden has not been completely performed so as legally to warrant an inference of such intent from the actual perpetration thereof. (p. 752).

2. BURGLARY—*Defense—Intoxication.*

   Such intoxication, if established by proof, precludes a finding of guilt of the breaking and entering of a building with intent to steal, when the proof shows only a breaking and entering, but not an actual taking nor any attempt to take. (p. 752).

3. CRIMINAL LAW—*Capacity—Specific Intent—Intoxication.*

   If, in such case, the proof of temporary dementia occasioned by intoxication is so full, clear and decisive as to leave no room for a reasonable opinion to the contrary, the trial court should direct the jury to find the defendant not guilty, if requested to do so, and, if it has failed in that respect, it should sustain a motion made in due time, to set aside the verdict and grant a new trial. (p. 753).

(WILLIAMS, JUDGE, dissenting).

Error to Circuit Court, Marshall County.

Charles Phillips was convicted of breaking and entering a railroad station house with intent to steal, and he brings error.              *Reversed and remanded for new trial.*

*Martin Brown,* for plaintiff in error.

*E. T. England,* Attorney General, and *Charles Ritchie,* Assistant Attorney General, for the State.

POFFENBARGER, JUDGE:

Under a sentence of confinement in the penitentiary for a period of one year, pronounced upon a verdict convicting him of having broken and entered a station house of the Baltimore and Ohio Railroad Company, with intent to steal, the plaintiff in error complains only of the refusal of the trial court to direct a verdict in his favor, and the overruling of his motion to set aside the verdict.

As to the state, the case was submitted without instructions. At the instance of the prisoner, nine instructions covering all phases of the case, as made out by the evidence, were given. Though every instruction given has some basis or foundation in the evidence, justifying the giving thereof, it is insisted that the verdict is against the decided weight and preponderance of the evidence and should be set aside for that reason.

The breaking and entering charged are fully established. Shortly before two o'clock in the morning of a certain day in January 1917, the prisoner broke open the door leading into the waiting room of a little station called, Clarington, and entered that room of the building. He remained there for about a half an hour before he was arrested, but, in that period of time, he made no effort, so far as the evidence discloses, to enter the ticket office in which there were $2.00 in money and about $1,000.00 worth of express packages. No weapons, keys, chisels, punches or other instruments such as burglars might carry were found on his person. Of the three witnesses introduced by the state, only one testifies to a confession of intent to steal. He says the prisoner told him

he had broken into the station to get whatever he could find that was worth carrying away. Another says he told him he was guilty and had so plead in the justice's court, since it was useless to make defense. The third says he said he intended to enter the office. If the prisoner's mental condition was natural or normal on the occasion, this testimony with proof of his having broken and entered the room would amply sustain the verdict. *People* v. *Griffin,* 77 Mich. 585; *State* v. *McBride,* 97 N. C. 393; *Vickery* v. *State,* 137 S. W. 687; *People* v. *Soto,* 53 Cal. 415; *Painter* v. *State,* 26 Tex. App. 454; *Alexander* v. *State,* 31 Texas Cr. R. 362.

But mental irresponsibility for his conduct on the occasion in question, brought about by over indulgence in intoxicating liquors, is relied upon as a circumstance sufficient to preclude the finding of guilt of the offense charged. As to his mental condition and as to whether he was drunk or sober at the time, all three of the witnesses introduced on behalf of the state are silent. In response to a question as to his physical condition, one of them said he was apparently in very good condition when he found him, but this statement manifestly does not reach the matter of mental condition. The building was broken into on Monday or Tuesday night and a witness says he had seen him staggering and falling on the previous Thursday evening. Another says that, at about four o'clock of the morning of the day on which the prisoner went from Round Bottom, the place at which he boarded, to Clarington station, a distance of about twelve miles, the latter woke him up, claiming there were people in the house and around it, looking in at the windows. He says the prisoner was very nervous at that time, so much so that he staid up with him. At some time in the forenoon of that day, he left the boarding house, saying he was going to a store to obtain some tobacco. He did enter a store and purchase and pay for tobacco, and the lady clerk who waited on him said he appeared to be grouchy and bewildered. How he traveled the distance of about twelve miles from Round Bottom to Clarington does not appear, nor is anything known of his conduct from sometime in the forenoon of the day until eight-thirty or nine o'clock in the evening, at which time the station

agent saw him on or near the railroad track at a point seven
or eight hundred yards from Clarington station, and going
in the direction thereof. At about eleven o'clock that night,
he entered a camp-car on the line of the railroad, at a place
about one hundred yards distant from the station, where he
was again seen by the station agent and two other parties
who were in the car. The night was cold and the ground
covered to some extent with snow, and he evidently entered
the car to warm himself by the fire the occupants had in it.
Of the three parties who saw him in the car, only one, the
station agent, testified, and he says he held no conversation
with him, but he heard him say the detectives were after
him, or somebody was after him, or wanted him. Whether
these remarks were directed to anybody or were mere inco-
herent mutterings does not appear. The prisoner's feet were
afflicted with rheumatism in consequence of which he had
cut holes in his shoes, or one of them, and wore socks on the
outside of them. He also carried a heavy crutch. How long
he stayed in the camp-car is not disclosed. It was located
about one hundred yards from the station, and, at about 1:30
o'clock A. M., the occupants thereof heard a loud noise at the
station. The testimony indicates that they did not go down
immediately to ascertain what had happened and that, be-
fore they did so, they communicated by telephone with the
dispatcher at Wheeling, asking directions from him as to
what to do. Having been told to "Get the fellow and hold
him," the agent and an officer went to the station and found
the prisoner in the waiting room thereof. It does not ap-
pear whether the other two occupants of the camp-car, went
along or not. Neither they nor the officer testified. The
prisoner had evidently hammered the door open with his
crutch and was in the waiting room without a light. When
the agent and officer reached the door, he was heard walking
toward it from the back part of the room. He offered no
resistance and told them to shoot him, if they desired to do
so, as he did not care whether he lived or not. He was that
morning conveyed to Moundsville and committed to jail by
a justice to await an indictment. About two hours after he
was locked up in jail he told the jailer he had plead guilty.

At that time, he did not appear nervous, but became very much so in the evening. He then told the jailer he had been drinking, and he looked as if he had been drinking pretty hard. His feet were very badly frozen, and a physician was called to treat them. He swears he has no recollection whatever of having been at the store at which he purchased tobacco, or the station, or in the jail until he got up one morning and found himself in a strange place. He said he had a faint recollection of having been somewhere, but was unable to say whether he had been at the camp-car or not, and that he did not know his feet were frozen, until he came to himself in the jail. He testified he had been drinking, and other witnesses say he had been a hard drinker for years.

Offenses in which specific intent to do the forbidden act is not an essential element were never excused, at common law, by mere drunkenness of the perpetrator of the act, even though it was so extreme as to wholly deprive him of his reason. *State* v. *Kidwell*, 62 W. Va. 466; *State* v. *Robinson*, 20 W. Va. 713; *Hopt* v. *People*, 104 U. S. 631. One who had broken into a house not his own and therein appropriated to his own use personal property of the owner, was subjected to the same rule in *State* v. *Shores*, 31 W. Va. 491, notwithstanding essentiality of specific intent to the commission of the crime. Since the intent to steal could be inferred from the act of appropriation, 2 Bish. Crim. L. 8th Ed., sec. 115, Whar. Crim. L. 11th Ed. 1224, the rule may have been properly applied in that case; but lack of proof of an actual taking of any property, after the entry of the building, and of any attempt to do so, manifestly distinguishes this case from it. In *State* v. *Shores*, the offense was complete. In addition to the breaking and entering, there was an actual taking from which the intent could be inferred. Here, the prisoner broke and entered the building, but took nothing. In the crime of burglary, there are always two intents, one to break and enter, which must be executed, and the other to commit, in the building, a theft or other offense, which may be executed or not. 1 Bish. Crim. L., 8th Ed., sec. 342; 2 Bish. Crim. L. 8th Ed., sec. 112. Since the prisoner's intention to steal cannot be inferred from anything done by him, it is

an open question dependent upon the force and effect of other evidence, and all the authorities seem to agree that complete deprivation of reason by intoxication eliminates the essential element of specific intent, when such intent is essential, and precludes a finding of guilt. *Schwabacher* v. *The People,* 165 Ill. 618; *Bartholomew* v. *People,* 104 Ill. 601; *State* v. *Bell,* 29 Ia. 316; *Ingalls* v. *State,* 48 Wis. 647; *Crosby* v. *People,* 137 Ill. 325; *Hopt* v. *People,* 104 U. S. 631; Whar. Crim. L., 11th Ed., 93.

Though mental incapacity to form an intention to steal, occasioned by intoxication, if established, renders the prisoner incapable of commission of the crime charged, the evidence of such incapacity, to preclude the finding of guilt, must be full, clear and decisive. If it is so loose, open or scant as to make room for different opinions as to its conclusiveness by reasonable men, it does not suffice. *Coalmer* v. *Barrett,* 61 W. Va. 237. The rule is the same in both civil and criminal cases. *State* v. *Clifford,* 59 W. Va. 1; *State* v. *Michael,* 74 W. Va. 613.

Notwithstanding the intelligent expressions attributed to the prisoner by some of the witnesses, his gross intoxication is overwhelmingly established by the evidence. Manifestly, he was at the worst stage of a long period of inebriation. The delusion with which he awoke at an early hour of the morning remained with him until a very short time before he broke into the station, as is disclosed by the station agent's testimony. He was not pursued by any officers or detectives and his assumption that he was could have been nothing more than the false conception of a disordered mind. He had been convicted of unlawful retailing of liquors at Clarington, Ohio, just across the river from the place at which he boarded, on one or more occasions, but he had been residing for some time on the West Virginia side of the river, within easy reach of the Ohio officers, if he had been wanted, and had not been molested. The manner and circumstances of his breaking into the station were wholly at variance with intelligent action. He hammered the door in with a crutch, at a point within a hundred yards of a camp-car in which he knew there were occupants, if he was in possession of his

senses. As they had not dispersed nor retired, he had presumptively just left them. How long he remained with them does not appear. If he had had intent to go into the office, no doubt he would have attacked the office door as he did the outer door, as there was no more reason for secrecy in the one case than in the other, but he did not. He proved a good reputation for honesty and also for obedience to all laws except one or one class thereof. If Bartley's testimony is true, he was delirious in the morning, and the agent's statement as to his mutterings in the camp-car corroborates Bartley and tends to prove the same mental condition late at night. All of this tends to sustain the prisoner's own denial of consciousness of his acts or condition throughout the period in question. None of the evidence relied upon to prove mental incapacity is contradicted, and its probative force is opposed only by confessions and statements attributed to the prisoner and inferences arising from his conduct. Apparently rational remarks and responses to questions often come from crazy people and even from people who are asleep, and those attributed to the prisoner are not sufficient to overcome the proof of his temporary dementia. These facts and circumstances explain the recklessness of the attack upon the station building, which alone would not suffice to prove lack of felonious intent.

The judgment will be reversed, the verdict set aside and the case remanded for a new trial.

*Reversed and remanded for new trial.*

WILLIAMS, JUDGE, *(dissenting)*:

The opinion holds that the evidence is not sufficient to warrant the jury in finding that the prisoner intended to steal at the time he broke and entered the building. The intent may properly be inferred from the act of breaking and entering, when no other purpose therefor is made to appear. The accused offered no explanation for it, except to swear he did not remember to have been in the building. Did not the jury have to determine the value of his testimony? They may not have believed him; evidently they did not. A witness for the state swears the prisoner admitted, when arrested in

the building, that he intended to take whatever he could find, and his only denial of that statement is that he does not remember what he did. His statement at the camp car, that detectives were after him and his act in breaking open the station door in hearing of the occupants of the car may both have been rational. It does not appear how long he had been absent from the car before he battered open the station door. It may have been two and a half hours, and he may have thought the men in the car were then sound asleep and would not be easily wakened at the early hour of two o'clock in the morning. It, is proven by his own witnesses that he had been accused of violating the law, just across the river in the state of Ohio, and his statement, apparently irrational, that detectives were after him, may have been a reasonable supposition originating in a guilty conscience. That he had been drinking hard some days before,. what he did on the day he was arrested, together with all the other facts in the case, bearing on the condition of his mind, are, in my opinion, sufficient evidence to carry the case to the jury on the question of the prisoner's mental capacity to entertain a specific intent and whether he actually had such intent to steal. In view of that evidence the court gave the following instructions, most favorable to the accused:

"The Court instructs the jury that the defense that the defendant had been drinking to excess and was so intoxicated that he did not know what he was doing or did not know that he was doing wrong at the time he entered the building in question is a denial of criminal intent, and throws upon the State the burden of proving such criminal intent beyond all reasonable doubt, and the defendant is not required to establish such defense by a preponderance of the evidence. And unless the jury find from the evidence that the state has proved such criminal intent beyond all reasonable doubt, you will find the defendant not guilty."

Insanity is not proven and the evidence respecting his alleged irresponsibility, as a result of intoxication, is not so clear as to warrant the court in holding that it does not support the verdict. The jury had the right to decide, from all the prisoner said and did, that he was capable of having, and

did have a specific intent to steal when he broke and entered the building. That he found nothing that he could appropriate is not material. I would affirm the judgment.