# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**State of West Virginia,**
**Plaintiff Below, Respondent**

**vs.)  No. 21-0651** (Clay County CC-08-2018-F-33)

**Robert L. Holcomb,**
**Defendant Below, Petitioner**

## MEMORANDUM DECISION

Petitioner Robert L. Holcomb, by counsel Andrew J. Katz, appeals the July 13, 2021, order of the Circuit Court of Clay County sentencing petitioner to confinement in the penitentiary for a period of not less than one nor more than five years for the felony offense of attempting to disarm an officer. Respondent State of West Virginia, by counsel Patrick Morrisey and Andrea Nease Proper, filed a response in support of the lower court's order. Petitioner filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the order of the trial court is appropriate under Rule 21 of the Rules of Appellate Procedure.

In November of 2018, petitioner was indicted on one count of attempting to disarm an officer in violation of West Virginia Code § 61-5-17(b). That section provides, "A person who intentionally disarms or attempts to disarm a law-enforcement officer . . . acting in his or her official capacity is guilty of a felony and, upon conviction thereof, shall be imprisoned in a state correctional facility not less than one nor more than five years."[1] W. Va. Code § 61-5-17(b).

Petitioner's case proceeded to a one-day jury trial on March 30, 2021. The State presented the testimony of two witnesses: Cpl. T.M. Caruthers and Trp. E.C. Greathouse. Petitioner presented the testimony of his mother, Beverly Holcomb, and he testified on his own behalf.

Cpl. Caruthers testified that on March 15, 2017, he was employed by the Clay County

---

[1] The 2014 version of West Virginia Code § 61-5-17 was in effect when petitioner committed the crime. Although the statute was amended in 2019 and again in 2020, the language in subsection (b) has remained consistent with the 2014 version of the statute.

1

Sheriff's Department as a deputy sheriff. He testified that on that date, he and Trp. Greathouse traveled to petitioner's residence to arrest petitioner pursuant to a criminal warrant. Cpl. Caruthers explained that, upon arriving at the home, petitioner's wife permitted them to enter. When asked what he did upon entering the home, Cpl. Caruthers testified:

> We went straight to the bedroom, which [petitioner's wife] did inform us that [petitioner] was in, and then we proceeded to take custody of [petitioner]. He was under the bed. I lifted the bed and [Trp.] Greathouse initially made contact with [petitioner]. At which time, a struggle occurred between the two. I went hands on with [petitioner], trying to get him into custody, trying to get him handcuffed. At which time, that's when he put his hand on my weapon. More specifically, that's when he placed his hand on the pistol grip of my weapon. I knew this because I could feel, I could feel that the gun moved on my belt. It's a very specific, very specific feeling when someone's trying to grab your weapon.

Cpl. Caruthers further testified that, when this occurred, he said "something to the effect of, 'oh, you're grabbing my holster?' Or, 'You're grabbing my weapon.'" Cpl. Caruthers claimed that he saw petitioner's hand on the grip of his firearm and that, at the time, petitioner was lying on his back. Cpl. Caruthers told the jury:

> At the time, as I said earlier in my statement, myself and [Trp.] Greathouse were trying to get [petitioner] into custody. We were struggling. We were on the ground at this point. [Trp.] Greathouse -- to the best of my knowledge, [Trp.] Greathouse was just trying to gain . . . control of one of [petitioner]'s arms and just keep control of his legs. I was on the other side trying to gain the other hand just so we could get him cuffed up like that, trying to over[]power him so we could get him cuffed.

Cpl. Caruthers denied beating petitioner, although he went on to testify, "I can't recall where specifically [petitioner] was struck. In a situation like that, palm strikes happen. . . . He chose to grab my weapon, that escalates things a bit."

Trp. Greathouse testified that on March 15, 2017, he was employed by the West Virginia State Police. He described his encounter with petitioner on that day as follows:

> We arrived at the residence, knocked on the door and announced our presence. It took a little bit, eventually [petitioner's wife] did answer the door. We inquired of her where was [petitioner] at, you know, we had some paperwork for him. Initially, she said I don't know where he's at, but then she ultimately whispered that he was hiding underneath the bed. So, we just asked her to step outside, and then we went in. We didn't directly, you know, lift the mattress up and look under the bed. We announced our presence to see if he would come out, which he didn't, and ultimately we found him hiding under the bed. . . .
>
> . . . .

2

When he wouldn't comply, . . . myself and [Cpl.] Caruthers lifted the mattress, and there he laid.

. . . .

I'm sure I told him to get up, but in the process of telling him to get up, I went ahead, just so he wouldn't do anything, I went ahead and grabbed him.

. . . .

I grabbed him by the [right] arm and pulled him up, and when I pulled -- when I jerked him up, I don't know if it was a reaction of his, but he tensed up like he was going to pull away from me, and so at that time, we took him to the ground.

. . . .

Again, adrenaline is pumping, take him to the ground. Couldn't gain control of his hand. I was going after his left arm, at that point. His legs were kind of kicking. We did do some strikes to the upper torso area of his body in efforts to gain control of his left arm. And then, ultimately, I did gain control of his left arm, and ultimately he was placed in handcuffs, and [Cpl.] Caruthers, ultimately, gained access to his right arm, and he was placed in handcuffs.

Trp. Greathouse testified that, during the struggle, petitioner was "laying belly down." Trp. Greathouse further testified that, in addition to the strikes to petitioner's upper torso, he believed petitioner also received a couple blows to the head. Trp. Greathouse elaborated: "He wasn't -- I wouldn't say he was throwing punches at us, but he was laying on his hands. He was tensed up, which may be a result of, you know, everything that's going on, but he wasn't just laying there with his hands behind his back." Trp. Greathouse also testified that during the struggle, which he believed took between fifteen and thirty seconds, he heard Cpl. Caruthers say, "'Oh, you're grabbing my gun' or 'He's trying to grab my gun.' Something of that nature." The trial court asked Trp. Greathouse, "So whether he, in fact, had his hand on [Cpl.] Caruthers'[s] weapon [or] not, you don't know?" Trp. Greathouse responded, "Correct, sir."

Following the testimony of the two officers, the State rested its case, and petitioner made a motion for acquittal on the ground that the evidence was insufficient to convict him. The trial court denied the motion. Petitioner then proceeded to call his two witnesses, Ms. Holcomb and himself.

Ms. Holcomb testified that, on the day before petitioner's arrest, his bed "consisted of two mattresses on the floor." She also testified that there was a way to exit the house such that a person at the front door would not witness someone exiting.

During his testimony, petitioner reiterated the testimony of Ms. Holcomb, explaining that his sleeping situation consisted of "two mattresses [on the floor] because I didn't have [a] boxspring to use a bed frame." He also stated that, had he wished to avoid the officers, he could

3

have exited through a back door located six feet from his bed. Regarding his interaction with the officers, petitioner testified:

> [My wife and I] was in bed. There was a knock on the door. They said the police was out there. I was in the back trying the mattress, so I told my wife to answer the door. She gets up, puts her pants on and she is walking through the bedroom and goes and answers the door. They asked where I was at. She said in the bed. I was the one that had her go answer. So as I'm getting out of the bed, two cops come in the front through my living room and straight into my bedroom and said I'm under arrest.
>
> . . . .
>
> . . . [Cpl.] Caruthers is the one that grabbed a hold of me and jerked me down. I actually was handcuffed immediately. This guy, Caruthers, had gloves on and instantly started beating on me and the other officer actually said "That's enough." He was a decent guy. I can't say anything bad about him because he pulled this guy off.

Petitioner denied attempting to disarm Cpl. Caruthers, and he claimed that he never had the opportunity to reach for Cpl. Caruthers's gun. Petitioner testified that, while he was on the floor, he was face down. He estimated that the struggle ensued for "at least a good near minute."

After petitioner completed presenting his evidence, the trial court instructed the jury on the law controlling the matter, and the parties gave their closing arguments. Petitioner's counsel argued:

> This is why [Cpl.] Caruthers took the position that his weapon was grabbed for, which is creating a crime, because to cover his beating on my client. . . . Let's just say . . . the sheriff's department is sued for the beating that [petitioner] took. Which one is easier to defend, a guy who didn't commit any crime or a guy that you can pin a crime on? . . . That is the key to the entire case, because it explains why they had to -- why [Cpl.] Caruthers had to create some crime on behalf of my client in order to defend some future litigation that they are afraid of in the future.

The matter was submitted to the jury, and the jury returned a verdict of guilty on the charge of attempting to disarm an officer. The trial court entered a jury trial order, which contained the jury's verdict, on April 14, 2021.

On April 26, 2021, petitioner filed a motion for acquittal and, in the alternative, for a new trial pursuant to Rules 29 and 33 of the West Virginia Rules of Criminal Procedure. Petitioner argued that "[to] determine the specific details of much of what happened is difficult because there were numerous inconsistencies in the testimony of the State's witnesses." Petitioner asserted that he was seeking an acquittal based on the lack of evidence of intent, and he asserted that he was entitled to a new trial in light of the overall weakness of the State's case. Following a hearing on the petitioner's motion, the trial court entered an order on June 9, 2021, denying the motion. The

trial court wrote: "The [c]ourt FINDS that the State of West Virginia provided sufficient evidence and that evidence was viewed in light most favorable to the State of West Virginia. Therefore, the Court DENIED the [petitioner]'s Motion."

By order entered on July 13, 2021, the trial court sentenced petitioner to confinement in the penitentiary for a period of not less than one nor more than five years, directing that petitioner receive credit for time served.

Petitioner now appeals the trial court's July 13, 2021, order. Through his two assignments of error, he argues that the trial court erred by denying his motions for acquittal and for a new trial. He contends that his motions should have been granted because there was a lack of evidence from which the jury could reasonably find he intended to disarm Cpl. Caruthers and because the State's case was weak and implausible. Petitioner asks this Court to reverse the trial court's denial of his motion for acquittal or, in the alternative, to reverse the denial of his motion for a new trial and remand the case to the trial court for a new trial.

"The Court applies a de novo standard of review to the denial of a motion for judgment of acquittal based upon the sufficiency of the evidence." *State v. Juntilla*, 227 W. Va. 492, 497, 711 S.E.2d 562, 567 (2011) (citing *State v. LaRock*, 196 W. Va. 294, 304, 470 S.E.2d 613, 623 (1996)). The Court applies the following standard of review to the denial of a motion for a new trial:

> We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a de novo review.

Syl. Pt. 3, in part, *State v. Vance*, 207 W. Va. 640, 535 S.E.2d 484 (2000).

Petitioner argues that a reasonable juror could not have concluded that petitioner intended to disarm Cpl. Caruthers. According to petitioner, the fact that petitioner touched Cpl. Caruthers's firearm—if he indeed touched at all—does not show an intent to disarm. Rather, petitioner contends that any contact he may have had with Cpl. Caruthers's firearm would have been incidental to the scuffle with the officers and occurred while he was flailing. Additionally, petitioner asserts that the inconsistencies in the officers' testimonies highlighted the weakness of the case against him: Trp. Greathouse testified that petitioner was on his front during the confrontation while Cpl. Caruthers testified that petitioner was on his back; Cpl. Caruthers first stated that petitioner reached for his holster before claiming that petitioner reached for his firearm; and Cpl. Caruthers first implied that he struck petitioner and then later stated that he did not recall striking petitioner. Finally, petitioner claims that the officers' testimony was implausible, stating that if petitioner was face-down during the struggle, there would have been no way for him to reach up and grab Cpl. Caruthers's firearm because petitioner "would not have even been able to see the gun as his eyes would have been pointing at the ground." Petitioner argues that if he was on his back, as Cpl. Caruthers claimed, Trp. Greathouse would have seen petitioner grab Cpl. Caruthers's firearm, and petitioner would not have grabbed for the firearm because his hands and arms were being restrained by "two strong law enforcement officers."

In essence, petitioner's argument boils down to a single issue: whether the evidence was sufficient to support the jury's verdict. On this issue, we have held:

> The function of an appellate court when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, is sufficient to convince a reasonable person of the defendant's guilt beyond a reasonable doubt. Thus, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt.

Syl. Pt. 1, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995); *see also LaRock*, 196 W. Va. at 304, 470 S.E.2d at 623 ("[T]his Court, like the trial court, must scrutinize the evidence in the light most compatible with the verdict, resolve all credibility disputes in the verdict's favor, and then reach a judgment about whether a rational jury could find guilt beyond a reasonable doubt."). We have further held,

> A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.

*Guthrie*, 194 W. Va. at 663, 461 S.E.2d at 169, Syl. Pt. 3, in part.

Upon applying these rules to petitioner's case, we determine that petitioner is not entitled the relief he seeks. As noted above, Cpl. Caruthers testified that he saw petitioner's hand on the grip of his firearm and that he felt the firearm move on his belt in the specific way that he associated with someone trying to grab his firearm. Cpl. Caruthers also testified that, contemporaneously, he exclaimed that petitioner was grabbing his weapon, and Trp. Greathouse confirmed Cpl. Caruthers's testimony on this point. We are bound by our precedent to presume that the jury found this testimony to be credible and plausible. Viewing the evidence in the light most favorable to the prosecution, we determine that any rational trier of fact could have found, beyond a reasonable doubt, that petitioner intentionally attempted to disarm Cpl. Caruthers while Cpl. Caruthers was acting in his official capacity as a police officer. Accordingly, we conclude that the evidence was sufficient to support petitioner's conviction.

Having determined that the evidence was sufficient to support petitioner's conviction, on our de novo review of the case, we conclude that petitioner was not entitled to be acquitted of the charge against him. Consequently, the trial court committed no error in denying petitioner's motion

for acquittal. Additionally, because the evidence was sufficient to support petitioner's conviction, the trial court did not abuse its discretion in denying petitioner's motion for a new trial.

For the foregoing reasons, we affirm.

Affirmed.

**ISSUED:**  August 30, 2022

**CONCURRED IN BY:**

Chief Justice John A. Hutchison
Justice Elizabeth D. Walker
Justice Tim Armstead
Justice William R. Wooton
Justice C. Haley Bunn